IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

v.

QUINN A. GOFFIGAN,

Defendant.

- - - - - - - - - - - - - - - - - - - -

CRIMINAL ACTION NO. 2:16cr34

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

February 26, 2016

BEFORE: THE HONORABLE LAWRENCE R. LEONARD
United States Magistrate Judge

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
By: Kevin Hudson
Assistant United States Attorney
Counsel for the United States

FEDERAL PUBLIC DEFENDER'S OFFICE
By: Suzanne Katchmar
Assistant Federal Public Defender
Counsel for the Defendant

(Hearing commenced at 10:12 a.m.)

THE CLERK: United States of America versus Quinn A. Goffigan, case number 2:16mj82.

Are counsel ready to proceed?

MR. HUDSON: Yes, ma'am. The Government is ready. Good morning, Your Honor.

THE COURT: Good morning, Mr. Hudson.

MS. KATCHMAR: Good morning, Your Honor. Suzanne Katchmar appearing with Mr. Goffigan. We are prepared to proceed on both matters today.

THE COURT: All right. Good morning, Ms. Katchmar. I haven't seen you in awhile. You've been busy in other people's courtrooms, I guess.

MS. KATCHMAR: That is, but I'm happy to be here.

THE COURT: Good. Well, we're here for a preliminary hearing and a detention hearing in the matter of United States versus Quinn Goffigan. So let's start with the preliminary hearing. Ms. Katchmar, your client's ready to go forward.

Mr. Hudson, let me hear from you.

MR. HUDSON: Yes, sir. And the Government would call Task Force Officer James Thomas to the stand.

THE COURT: All right. Agent Thomas, if you'd come forward, please.

MS. KATCHMAR: Your Honor, may we have a moment? We

are having some technical difficulties here.

THE COURT: All right.

MS. KATCHMAR: All good. Thank you so much.

(Witness was sworn.)

JAMES A. THOMAS, called by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HUDSON:

Q. Good morning, sir. Will you tell us your name, please.

A. Good morning, Your Honor. James Thomas. I am a detective with the City of Virginia Beach Special Investigations Narcotics, also assigned to the DEA drug narcotic task force in Norfolk, Virginia.

Q. How long have you been on the DEA task force, sir?

A. I've been working with the DEA task force for approximately 11 to 12 years now. I've been on Virginia Beach Police Department going on 26 years. I've been in special investigation, run narcotic investigations, both federal and state, for approximately 22 years now.

Q. And are you the primary task force officer assigned to this case?

A. Yes, I am.

Q. Sir, let me direct your attention to February the 17th of 2014. Did there come a time that day that you swore out a complaint, an affidavit against a Quinn Goffigan?

A. Yes, I did. 09:51:3
Q. And, sir, do you see Mr. Goffigan in the courtroom today? 09:51:3
A. I sure do. He is sitting to the left of Ms. Suzanne Katchmar in the orange jumpsuit. 09:51:3 09:51:4
Q. And did you prepare an affidavit in connection with this case? 09:51:4 09:51:5
A. Yes, I did. 09:51:5
Q. Okay. Sir, let me show you what I've marked as Government's Exhibit Number 1. 09:51:5 09:51:5

MS. KATCHMAR: I've previously seen it, Your Honor. I have no objection. 09:52:0 09:52:0

THE COURT: All right. Thank you, Ms. Katchmar. 09:52:0

MS. KATCHMAR: Not to the content and the veracity of it but simply that is the affidavit. 09:52:1 09:52:1

THE COURT: I understand. 09:52:1

BY MR. HUDSON: 09:52:1
Q. And, sir, do you recognize Government's 1? 09:52:1
A. Yes, sir, I do. It has my initials on each page and signature on the back page. 09:52:2 09:52:2
Q. Is this the affidavit you swore out on February 17th? 09:52:2
A. Yes, it is. 09:52:3
Q. Okay. Does it contain everything you know about this defendant's case? 09:52:3 09:52:3
A. No, it doesn't. 09:52:3
Q. Is it a fair and accurate copy of that affidavit? 09:52:4

A. Yes, it is.

MR. HUDSON: Okay. And I'll ask the Court to receive that now as Government's Exhibit Number 1.

THE COURT: All right. Any objection?

MS. KATCHMAR: I do, Your Honor. I simply have one question related to the information contained therein.

THE COURT: All right. Go ahead. You may ask.

MS. KATCHMAR: May I stand at table?

THE COURT: You can do it from there. That's fine.

MS. KATCHMAR: Thank you. I would simply ask, Detective Thomas, do you have personal knowledge and not hearsay knowledge of the information contained in that affidavit?

THE WITNESS: The knowledge that I have that from that came from police reports, Virginia Beach police reports that I personally have read.

MS. KATCHMAR: So not your personal knowledge?

THE WITNESS: That I personally read the Virginia Beach police reports.

MS. KATCHMAR: But the facts contained in the reports you do not have any personal knowledge?

THE WITNESS: If you're asking was I there, I was not there.

MS. KATCHMAR: Your Honor, I would object as there is -- the witness would not be able to testify as to the

09:52:5 09:52:5 09:52:5 09:53:0 09:53:0 09:53:0 09:53:1 09:53:1 09:53:1 09:53:2 09:53:2 09:53:3 09:53:3 09:53:4 09:54:0 09:54:0 09:54:1 09:54:1 09:54:2 09:54:2 09:54:2 09:54:3 10:04:2 10:04:2 10:04:2

veracity and the information contained in those reports, and it is all based on hearsay, and therefore we would object. 10:04:2 10:04:3

THE COURT: All right. Overruled. Thank you. 10:04:3

(The document was received in evidence as Government's Exhibit No. 1.) 10:04:3 10:04:3

BY MR. HUDSON: 10:04:3

Q. And, Detective Thomas, the basis for your knowledge, is that set out in the affidavit? 10:04:3 10:04:4

A. Yes, it is. 10:04:4

Q. And, sir, I want to direct your attention to various portions of the affidavit, specifically -- 10:05:0 10:05:0

THE COURT: Hold on. 10:05:1

MR. HUDSON: I'm sorry, sir. 10:05:1

THE COURT: I have a copy, so that's fine. 10:05:1

MR. HUDSON: Thank you, sir. 10:05:3

THE WITNESS: Thank you. 10:05:4

BY MR. HUDSON: 10:05:4

Q. Detective, I'd like to direct your attention to Paragraph 4 in the affidavit, specifically the testing done by the state laboratory. Do you have an update on that testing for us today? 10:05:4 10:05:4 10:05:5 10:05:5

A. Yes, sir. 10:05:5

Q. Okay. And what is that? 10:07:2

A. The narcotics that was seized from this date was sent back to the state lab and asked them to perform a base 10:07:2 10:07:4

analysis test. And the report shows that the substance seized did contain crack cocaine or base cocaine, cocaine base.

Q. Now, sir, let me show you what I've marked as Government's Exhibit Number 2.

I apologize, sir. Let me show you now what I've marked as Government's Exhibit Number 2. Sir, do you recognize that?

A. Yes, I do.

Q. What is it?

A. It is the supplemental report for the substance that was seized in February of 2014 that was sent back to the lab.

Q. And is that the base analysis report you were just referring to?

A. Yes, it is.

MR. HUDSON: Okay. And I'd offer this now as Government's Exhibit 2.

THE COURT: All right. Any objection?

MS. KATCHMAR: Your Honor, we do object. We object based upon the following: The fact that it is supplemental, the basis for the information contained therein is based upon information not to the personal knowledge of this witness, and, in fact, the chain of custody has not been thereby established for the information contained in the report.

THE COURT: All right. Overruled. You know, this

is a preliminary hearing?

MS. KATCHMAR: I do, Your Honor. However, I do believe that some of this information is going to be before the Court put in fact. I understand the rules of evidence are very loose pursuant to Rule 1101. However, I am trying to establish a basis for my objection.

THE COURT: All right. Very well. Overruled.

(The document was received in evidence as Government's Exhibit No. 2.)

BY MR. HUDSON:

Q. And, sir, still keeping your attention on Paragraph 4 of the affidavit, certain phones are mentioned in Paragraph 4. Was a search warrant executed on those two cell phones?

A. Yes, sir.

Q. Okay. Was that a state search warrant?

A. Yes, it was.

Q. Okay. Now, are you able to summarize for the Court what was found in those phones?

A. Absolutely.

Q. Okay. Would you please just give the Court a brief summary of some of the highlights from those two cell phones.

A. In viewing the report from the cell phones, the contents of the cell phone, it contained phone numbers of an individual actually that I spoke with that provided additional information about Mr. Goffigan's drug trafficking

activities. It contained pictures of Mr. Goffigan himself. It contained pictures of large sums of cash that were spread out. It contained a picture of a number of large sum of cash, and also had a firearm, a black handgun with it with an extended clip, and it ex -- it also had a few text messages on there that, based on my experience as a narcotics detective for 22 years, I viewed them as being drug related.

Q. Can you explain that a little bit to the Court so we know what you're talking about.

A. In particular there was a person that was looking to get what he called a zone, and he was having a difficult time with meeting up with Mr. Goffigan to get that zone, and he talked about, you're making me look bad. I've had these people waiting, you know, just trying to get a zone.

Q. And --

A. Also, there was a photograph of a maroon-colored Lexus, which was the same vehicle that Mr. Goffigan was with when he was encountered in February of 2014.

Q. And I don't know if you mentioned but based on your training and experience, what is a zone?

A. I'm sorry. It's an ounce. I've known it to be an ounce of a controlled substance, whether it's crack or powder cocaine or heroin, but a zone is generally referred to as an ounce.

Q. And, sir, let me direct your attention now to Paragraph

 number 5 in this affidavit and specifically the testing by the Department of Forensic Science referenced in Paragraph 5. Do you have an update on the forensic science testing of the substance that's referenced in Paragraph 5 of your affidavit?

A. Yes, I do.

Q. Okay. And what is that?

A. The -- again, the drugs were sent back to the state lab and requested that a base analysis be performed, and the report came back and showed that it was crack cocaine or base cocaine, cocaine base.

Q. Sir, let me show you what I've marked as Government's Exhibit Number 3.

THE COURT: Have you been provided a copy, Ms. Katchmar?

MS. KATCHMAR: I have, Your Honor. Thank you.

BY MR. HUDSON:

Q. Well, sir, do you recognize that?

A. Yes, I do.

Q. What is it?

A. It is the supplemental report received from the lab that shows the substance seized in August of 2015 as being cocaine base.

Q. Is it a fair and accurate copy of that certificate?

A. Yes, it is.

MR. HUDSON: I'd ask the Court to receive that now

as Government's Exhibit Number 3.

THE COURT: All right. Objection, Ms. Katchmar?

MS. KATCHMAR: Your Honor, I would just maintain my prior objection.

THE COURT: All right. So noted. Overruled.

(The document was received in evidence as Government's Exhibit No. 3.)

MR. HUDSON: And, Your Honor, at this point I have one of two things I could do. I could ask the detective to provide a little more information that would be germane to detention only, or I can stop now and proffer additional information. I'm comfortable doing either, whichever the Court and whichever counsel feels is the most appropriate course of action.

THE COURT: Well, let's complete the testimony of Agent Thomas. All right.

MR. HUDSON: Yes, sir.

THE COURT: So go ahead with whatever examination you wish on the issue of detention, and I'll consider them as appropriate.

MR. HUDSON: Thank you, sir.

BY MR. HUDSON:

Q. Detective, I want to direct your attention to one of the cooperating witnesses in this case who is -- did you talk to a cooperating witness in this case?

A. Yes, I did.

Q. Okay. And did the cooperating witness indicate whether or not he knew the defendant?

A. Yes, he did.

Q. Okay. Did he say that he did?

A. Yes, he did. He said he did know him.

Q. Okay. And if you could please describe for the Court whether or not the witness knew anything about the defendant's drug trafficking activities?

A. Yes, he did.

MS. KATCHMAR: Objection, overbroad.

THE COURT: Try to narrow it down a little bit, Mr. Hudson.

MR. HUDSON: Yes, sir.

BY MR. HUDSON:

Q. Sir, did the -- when did this witness indicate that he first knew the defendant to be involved in drug trafficking?

A. In approximately June/July of 2012.

Q. And what was the nature of it at that time?

A. The witness himself acknowledged that he was a crack cocaine user, and that he was introduced to Mr. Goffigan under the terms of purchasing crack cocaine from him.

Q. Did this witness ever become more than a user?

A. Yes, he did.

Q. Okay. Can you give us a little bit of the evolution to

that with respect to this defendant?

A. The witness had, over the course of time of dealing with Mr. Goffigan, who he also referred to as Kayla, that he purchased crack cocaine from him almost on a daily basis and it eventually involved to several times a day, and that at some point in time that the relationship evolved into around more trust, and he was allowed to see more of what Mr. Goffigan was doing.

Mr. Goffigan called him and relied on him for rides. Mr. Goffigan gave him large sums of money in the amounts of approximately $35,000 to hold for him. Mr. Goffigan borrowed money from him in sums of ten thousands of dollars, and he's also seen Mr. Goffigan cooking crack cocaine on numerous occasions. He mentioned in the sense where he saw Mr. Goffigan in possession of two kilograms of crack cocaine on Mellon Drive in Norfolk, Virginia at Mr. Goffigan's girlfriend, Tracy's house, and that he was removing two to three ounces of crack cocaine from one kilo and cooking it on the stove, and the other kilogram was left packaged.

Q. And, sir, to clear up, did this witness eventually start helping this defendant sell crack cocaine?

A. The witness, yes, he did. He was beginning to make deliveries for Mr. Goffigan, locations, he named locations to the Scarborough Square in Virginia Beach, Virginia, and an address on Kensington Drive in Virginia Beach, Virginia;

Calvin (ph.) Estates out in Chesapeake, Virginia, off of Cedar Road, and several other locations that he mentioned. 10:21:4 10:21:5

Q. And in doing so did this witness indicate about how much he was making on any given weekend? 10:21:5 10:22:1

A. Well, the defendant -- the witness himself wasn't making any money, but he was turning money over to Mr. Goffigan. And he said at times that he had made as much as $5,000 from a Friday to a Sunday, and as much as $1500 on a day making deliveries for Mr. Goffigan. 10:22:1 10:22:1 10:22:2 10:22:2 10:22:3

Q. Did this witness mention any guns as to Mr. Goffigan? 10:22:3

A. The witness said on occasions he seen Mr. Goffigan with a black handgun while he was counting large sums of money or cooking large amounts of crack. 10:22:3 10:22:5 10:22:5

Q. Did the witness indicate whether or not this defendant used one location or multiple locations to sell? 10:23:0 10:23:0

A. The witness advised that he used multiple locations. 10:23:1

Q. And last question, this particular witness, how much -- do you have a total or a ballpark total of how much crack cocaine this witness purchased from this defendant? 10:23:2 10:23:2 10:23:3

A. Yes, I do. 10:23:3

Q. And that is approximately what? 10:23:3

A. Well over a kilogram of crack cocaine. 10:23:3

MR. HUDSON: All right. Thank you, sir. Please answer any questions that Ms. Katchmar might have for you. 10:23:5 10:23:5

THE WITNESS: Thank you. 10:23:5

MS. KATCHMAR: Your Honor, may I have one moment, please?

THE COURT: All right. Go ahead.

MS. KATCHMAR: Thank you.

CROSS-EXAMINATION

BY MS. KATCHMAR:

Q. Good morning again, Detective.

A. Good morning, ma'am.

Q. Talking about the events of 2014 that are referenced in your complaint, I believe Paragraphs 3 and 4; is that correct? Do you have it in front of you?

A. Yes and no.

Q. I want to talk to you about the eventual contact and identification of some items, if we could.

A. Sure.

Q. First, you have in front of you a supplemental report of some drugs that were recovered at the scene; is that correct?

A. I don't have it in front of me but I did view it, yes, ma'am.

Q. All right.

THE COURT: Would you like the witness to have it?

MS. KATCHMAR: No, Your Honor. I know that he sees it and that was my only reference to it. Thank you so much.

BY MS. KATCHMAR:

Q. So, Detective Thomas, you were not present at the events

of February 2014? 10:25:4

A. No, ma'am, I was not. 10:25:4

Q. You did not see and experience what is referenced in the police reports from February of 2014? 10:25:4 10:25:4

A. No, I did not. 10:25:5

Q. And I'm specifically talking about the events identified in Paragraphs 3 and 4, February 19, 2014? 10:25:5 10:25:5

A. That's a no. 10:25:5

Q. Okay. Regarding those items, you know that there was a seizure of drugs that were alleged to have been dropped, correct? 10:26:0 10:26:1 10:26:3

A. Actually, what I know is from -- again, from the Virginia Beach police reports and information that I also know from talking with the cooperating witness, what I know is that there were drugs found in a red or maroon-colored Lexus, which is a picture on the phone that was recovered that was dropped by Mr. Goffigan. 10:26:3 10:26:4 10:26:4 10:26:5 10:27:0 10:27:1

Q. Okay. 10:27:1

A. And that there was another quantity, an ounce of powder cocaine that was thrown by a pool fence that the cooperating witness went back the next day, at the direction of Mr. Goffigan, went and got. 10:27:1 10:27:1 10:27:2 10:27:2

Q. Okay. That wasn't my question. I said on the day, there is an allegation that a person ran and dropped some cell phones, correct? 10:27:3 10:27:4 10:27:4

A. On the day --
Q. Yes.
A. -- the police officer --
Q. Yes.
A. -- that I know encountered Mr. Goffigan --
Q. Yes.
A. -- identified him --
Q. Yes.
A. -- and to arrest him, and Mr. Goffigan took off running, and cell phones were dropped.
Q. Okay. There were no drugs dropped seen by the officer?
A. There were drugs seen by the officer, what he believed was an exchange prior to approaching him, and then when he approached the car, he saw drugs in plain view in the car, and that's the reason why he went to arrest Mr. Goffigan.
Q. During the run there were no drugs seen dropped?
A. No.
Q. There was no chase near the pool?
A. I don't know that. I don't know that he chased him by a pool.
Q. Detective Thomas --
A. Uh-huh.
Q. -- the drugs that you identified or referenced by a cooperating witness that were an ounce found by the pool --
A. Yes.

10:27:4 10:27:5 10:27:5 10:27:5 10:27:5 10:27:5 10:28:0 10:28:0 10:28:1 10:28:4 10:28:4 10:28:5 10:29:0 10:29:1 10:29:1 10:29:2 10:29:2 10:29:2 10:29:3 10:29:5 10:29:5 10:30:0 10:30:0 10:30:1 10:30:2

Q. -- is information from a source other than a law enforcement agent?

A. Correct.

Q. Is that the same cooperating witness that Mr. Hudson was just asking you about regarding past use, purchase and sale?

A. Yes.

Q. Other than regarding Mr. Goffigan, have you had an opportunity to work with this cooperating witness in the past?

A. No.

Q. Regarding the cell phones, other than a search warrant made on the cell phones, what efforts were made to actually know whether or not they were owned by Mr. Goffigan?

A. The officer heard and saw the phones dropped while he was chasing Mr. Goffigan.

Q. I didn't ask you about possession, Detective. I said ownership. What other efforts were made to determine whether or not these were, in fact, owned?

A. To my knowledge, there are no other efforts that could be made until a search warrant is executed and then subpoenas for the phone records are done, and then in those cases the phones still may not come back to that person because many times narcotics -- narcotic dealers don't register things in their own name.

Q. So you don't know?

A. No.
Q. In terms of the cooperating witness in this case that Mr. Hudson was just talking about, it references back to a date, I think it was 2012?
A. Beginning in 2012, July/June of 2012.
Q. Okay. All in Virginia Beach?
A. Virginia Beach, Chesapeake.
Q. And have there been any seizure or review of bank records regarding Mr. Goffigan?
A. Not yet.
Q. Is that the intent of your investigation?
A. It may be a part of my investigation.
Q. Does this cooperating witness have his own felony criminal history?
A. Yes.
Q. And a substantial drug habit?
A. Yes.
Q. And some of the information, at least to date, you have been unable to corroborate, correct?
A. I've been able to corroborate a lot more than I've been able to not corroborate.
Q. High amounts of money, you have not been able to corroborate that?
A. I haven't been able to corroborate it, but with the pictures that I've seen on the cell phone with Mr. Goffigan's

face on them, there are closed sales amounts or could it be.

Q. You did not check the dates to determine whether or not it was, in fact, related?

A. No, I did not.

Q. You didn't check to determine whether or not those were pictures superimposed from the Internet?

A. No, I did not.

Q. You're aware that on the Internet you can just spell and find pictures of anything?

A. Absolutely.

Q. So at that point it's regarding the amounts and the pictures and as it relates to the confidential -- or cooperating witness, excuse me, I know there's a difference -- there has been no corroboration about the monies?

A. Again?

Q. Just speculation about the monies and the pictures and the cooperating witness?

MR. HUDSON: Your Honor, I'm going to object that this has been asked and answered. I think we have a --

THE COURT: Well, it's not the objection that seems appropriate. Why don't you start over and kind of use phrases.

MS. KATCHMAR: I will.

THE COURT: So just start over and ask the question.

BY MS. KATCHMAR:

Q. You have photos on the phone --

A. That's correct.

Q. -- that you looked at regarding money?

A. That's correct.

Q. You have a cooperating witness that you've never worked for talking to you about large sums of money?

A. That I've ever worked with before?

Q. Yes.

A. Yes, that's correct.

Q. Talking to you about large sums of money?

A. Correct.

Q. But that those large sums of money may not be those that you've seen on the telephone?

A. Correct.

Q. And you haven't checked the timing?

A. Correct.

Q. Or whether or not those photos on the phone are, in fact, real or superimposed?

A. Correct.

Q. When you talked to this cooperating witness was he in or out of custody?

A. In custody.

Q. And he has a significant felony criminal history related to drugs?

A. No, not related to drugs.
Q. Does he have a felony criminal history?
A. Yes, he does.
Q. State or federal?
A. State.
Q. Okay. Have you been to any locations in Scarborough or reviewed or had any surveillance there related to his comments?
A. I'm not sure what you're asking me. Have I been to those locations and those addresses based on his information?
Q. Yes.
A. I'm very familiar with those neighborhoods and also familiar with other information that places Mr. Goffigan in those neighborhoods dealing drugs, so when I hear that information from that cooperating witness, it only verifies what I already knew.
Q. So the answer is no, based upon the information the cooperating witness gave you, you then did not act, you relied on past information?
A. I'm confused with what you're asking me.
Q. Simple. The cooperating witness talked to you about --
A. Scarborough Square, yes.
Q. -- Scarborough Square?
A. Yes.
Q. And you're familiar with that area?

A. Yes.
Q. Drug trafficking in that area?
A. Yes.
Q. But related to the information provided to you by this cooperating witness, you then did not act, you relied on information you previously obtained?
A. Yes.
Q. From other cooperating witnesses?
A. From another cooperating witness, yes.
Q. That you had worked with in the past?
A. I have not worked with him but a lot of the detectives have.
Q. So you have not directly talked with him?
A. I have directly talked with him.
Q. Based upon what time frame?
A. Based upon what time frame?
Q. As it relates?
A. When did I talk to him or --
Q. Yes.
A. I talked to him in January 2015.
Q. About a year ago?
A. No. I'm sorry, January 2016.
Q. Okay. About a month ago?
A. Yes.
Q. Is he a state or federal --

A. What?

Q. -- individual.

A. Neither.

Q. Does he have a felony history?

A. Yes.

Q. History of drug use?

A. I don't know.

Q. Are you familiar with the places, I think you said Cedar Road that were referenced from Chesapeake?

A. I am not familiar myself, no.

Q. So you have not acted on the information that your cooperating witness has provided you as it relates to Cedar Road?

A. I have another detective or a task force officer who is from Chesapeake with the (Unintelligible) entity, and he was aware of the neighborhood. So, no, I did not act on it.

Q. To your knowledge, as you're the primary, did he move to attempt to corroborate or act on it?

A. No. No.

MS. KATCHMAR: Your Honor, may I have one moment, please?

THE COURT: All right.

BY MS. KATCHMAR:

Q. Your cooperating witness, when did he say the last time he had contact with Mr. Goffigan, the one that we're talking

about with Mr. Hudson?
A. April 2015.
Q. Over a year --
A. April 2015.
Q. Almost a year ago?
A. Yes.
Q. And you never said -- he just gave a very basic description of the gun; is that correct?
A. That's correct. Black handgun.
Q. I'm sorry?
A. A black handgun.
Q. Pretty general description?
A. Yes.
Q. Never said that he had been threatened by a gun with Mr. Goffigan?
A. No.
Q. Okay. Never said that he had been forced to use a gun by Mr. Goffigan?
A. No.

MS. KATCHMAR: I have no other questions. Thank you.

THE WITNESS: All right. Thank you, Ms. Katchmar.

Any redirect, Mr. Hudson?

MR. HUDSON: A little bit.

REDIRECT EXAMINATION

10:42:5 10:42:5 10:43:0 10:43:0 10:43:0 10:43:0 10:43:0 10:43:1 10:43:2 10:43:2 10:43:2 10:43:4 10:43:4 10:43:4 10:43:5 10:43:5 10:43:5 10:44:0 10:44:0 10:44:0 10:44:0 10:44:0 10:44:1 10:44:1 10:44:1

BY MR. HUDSON:

Q. Detective, during the search warrant of the phones we've been discussing, was there any contact information contained in the phone that would be indicative of it being the defendant's phone?

A. Yes.

Q. Okay. Will you please briefly describe that for the Court.

A. The phone number from that phone was the same phone number that the cooperating witness provided to me. He said that was Mr. Goffigan's phone. There were -- there was a particular text message for an address on Shortleaf Court in Virginia Beach where the cooperating witness said that Mr. Goffigan lived at with a young lady by the name of Ashley, Ashley Haynes, I believe it was, and that was on the phone, as well. I think that's --

Q. That's what you can think of off the top of your head?

A. That is what I can think of off the top of my head.

Q. Directing your attention to the detective that was involved in the February 19th, 2014 incident, was that a beat police or a narcotics detective or a -- what was his specialty, if any?

A. He was a uniformed officer. He was a master police officer. He has spent several years in special investigations. I have worked with him for several years and

then he went back to uniform for a short stint in time. 10:46:5

Q. And -- 10:46:5

A. He's still back in -- he's back in narcotics again now. 10:47:0

Q. Okay. And special investigations, does that cover drug crimes in Virginia Beach? 10:47:0 10:47:1

A. Yes, it does. 10:47:1

Q. Okay. Do you have a ballpark for how long he's been with the Virginia Beach Police Department? 10:47:1 10:47:1

A. I would say 15 years. 10:47:1

MR. HUDSON: Okay. Thank you, sir. 10:47:3

THE COURT: All right. Thank you, Mr. Hudson. 10:47:4

May this witness be excused? 10:47:4

MS. KATCHMAR: Yes. Thank you. 10:47:5

THE COURT: All right. Thank you, Agent Thomas. 10:47:5

THE WITNESS: Thank you. 10:47:5

(Witness excused.) 10:47:5

THE COURT: All right. Now, the Court recognizes that some of Agent Thomas' testimony is not specific to the question of probable cause on these charges but went to the issue of dangerousness to the community and the question of detention. 10:48:0 10:48:0 10:48:1 10:48:1 10:48:2

But I want to stick with the probable cause evidence first. If there is anything further, Mr. Hudson, do you have any further proffer you wish to make on probable cause? 10:48:2 10:48:2 10:48:3

MR. HUDSON: No, sir. 10:48:3

THE COURT: Ms. Katchmar, do you have any proffer you wish to make on probable cause? 10:48:3 10:48:4

MS. KATCHMAR: No, Your Honor. Thank you. 10:48:4

THE COURT: Do you wish to argue the probable cause question? 10:48:4 10:48:5

MS. KATCHMAR: No. We will stand on the evidence. Thank you. 10:48:5 10:48:5

THE COURT: All right. Then based on the Court's review of the evidence, including the affidavit and the testimony of Agent Thomas and the exhibits that were proffered, the Court finds that there has been probable cause to establish the charges, specifically possession with intent to distribute cocaine and cocaine base charges, that that crime was committed and that the defendant committed that crime. 10:48:5 10:48:5 10:49:0 10:49:0 10:49:0 10:49:1 10:49:2 10:49:2

Certainly, the specific events of February the 19th, 2014 and August the 10th of 2015, as relayed in the affidavit and as discussed by Agent Thomas, provides sufficient indicia that the defendant had been engaged in the sale of those drugs, along with the agent's testimony of the information from the cooperating witness, so I will find probable cause. 10:49:2 10:49:3 10:49:3 10:49:4 10:49:4 10:49:5

Now, on the question of detention, the charge here is a charge under the Controlled Substances Act for which the maximum sentence is at least ten years. 10:49:5 10:49:5 10:50:0

So, Ms. Katchmar, I'll look to you first. If you 10:50:0

have any factual proffer you wish to make to rebut the presumption of detention, because under 3142(f) there is a presumption so -- excuse me, (e), there is a presumption. So, if you have a factual proffer you wish to make, I'll be glad to hear it.

MS. KATCHMAR: Your Honor, this is where I always get a little confused so I look for a little bit of guidance from the Court. My proffer would have more to do with the facts in the pretrial report than it does to the allegations relating to Mr. Goffigan. So if the Court would like that simply an argument, I can.

Otherwise --

THE COURT: Yes, that would be fine. What I --

MS. KATCHMAR: My other proffer would be this, as it relates to the facts before the Court, if I may, in the affidavit and for probable cause. My proffer would be as follows: One, we have events that are over two years ago from today. There was at that time arrest. He was on bond. There was a significant period of time that followed. That case has not been resolved. It has now been nolle prossed in state court pursuant to a bond report in relation to charges being filed federally.

As it relates to the allegations from August 10th, 2015, once Mr. Goffigan was shot, there is those -- the allegation is those drugs were found in his pocket when

clothes were seized while lifesaving events were taking place. What I would like to state to the Court is the following: that there was nothing before the Court that those clothes were, in fact, necessary and important for investigation. There is no forensic information stating that they were useful and that they were collected. They state that they were collected, in the paragraph that follows, for forensic and investigative purposes.

There is nothing before that Court -- the Court stating that that was, in fact, done. The clothes then were taken, and we don't know the circumstances surrounding what was going on before the medical personnel showed up. There was several people in the area, we would assert, and there is also an allegation that there were some drugs involved.

So we would say that the chain of custody regarding the drugs is at issue. Whether or not they could have even been seized and the clothing was seized is an issue, and whether or not the hospital personnel were acting under color of law enforcement when they handed that over. So we believe that it may, in fact, be an improper search.

Based upon that, that would be our proffer relating to some of the facts that are contained in the affidavit.

THE COURT: All right.

MS. KATCHMAR: Everything else would be argument as it relates to his detention.

THE COURT: Well, and I understand, so you're relying on some of the information in the pretrial services report --

MS. KATCHMAR: Yes.

THE COURT: -- with respect to, for instance, the defendant was a lifelong resident of the area. You mentioned in the first part of your proffer that he was on bond from the February 2014 charges.

MS. KATCHMAR: Yes.

THE COURT: But the Court has no information about what happened with respect to the charges that apparently were levied as a result of the August 2015 seizure of narcotics when the defendant was shot. What I'm asking you about is, it looks like he was arrested on September 24th, and those charges were nolle prossed.

MS. KATCHMAR: Correct.

THE COURT: But where was he? Was he in the hospital? Was he released on bond? Was he in custody? I have no information about that. Do you have any you wish to proffer?

MS. KATCHMAR: I do. I believe that he had already gone home, and he had gone home and was at home, basically, convalescing. But let me refer that -- double-check that.

And that's what I remember because, as an offer of proof we were talking about this, that here he was, he'd been

shot. He goes home. He's at home convalescing. People, they were wearing -- a huge SWAT team came, and he ended up being taken into custody with an allegation that it wasn't known exactly where he was yet. He was still on probation. He was still on bond. And he was reporting as required to probation at that time. So there was not an issue of him being a risk, being at -- or failing to appear anyway. 10:55:4 10:56:1 10:56:2 10:56:2 10:56:2 10:56:3 10:56:3

THE COURT: So which arrest was this, the September one? 10:56:4 10:56:5

MS. KATCHMAR: The September one was related to the drugs that were found in the pants. 10:56:5 10:57:0

THE COURT: And then he was subsequently bonded again? 10:57:0 10:57:1

MS. KATCHMAR: No, Your Honor. He has been in custody since September 24th, 2015. 10:57:1 10:57:1

THE COURT: That is what I'm trying to find out. 10:57:1

MS. KATCHMAR: My apologies. I'm not trying to elongate this in any way. 10:57:2 10:57:2

THE COURT: Too late. No. So just so I understand, because if he had been bonded out a second time -- 10:57:3 10:57:5

MS. KATCHMAR: He has not. 10:57:5

THE COURT: -- then the Court would obviously take that into consideration as to the question of dangerousness. 10:57:5 10:57:5

MS. KATCHMAR: Correct. 10:58:0

THE COURT: All right. 10:58:0

          MS. KATCHMAR: No, he has been in custody since September 24th, 2015, and in the Virginia Beach jail. I would also proffer the people who are present here today, but then I would also provide some additional information from the bond report.

His mother, Mrs. Whorl, who is here, she's the young lady in the light blue shirt and the leather coat. His sister is behind her and to the left. She's in the black. And family friend, Takia Mentor, she's in the dark blue. Another family friend Janece Williams, she is sitting in the laced shirt. I sent Uncle Melvin out. He had Mr. Goffigan's small child, five months. So I felt it appropriate to send them out of the courtroom. And we have Tracy Shaw, Mr. Goffigan's long-time girlfriend. So with that, Your Honor, I can either move into my argument for rebuttal of the presumption or I can sit down.

THE COURT: Why don't you have a seat.

MS. KATCHMAR: Thank you.

THE COURT: I'll hear from Mr. Hudson about any factual proffer now the Government wishes to make.

MR. HUDSON: Well, sir, of course, the Government would ask the Court to consider the report prepared by probation in addition to what Detective Thomas, to his testimony just a few minutes ago.

The only other things I would offer the Court in the

way of facts that might be somewhat responsive to the concerns the defense brought up, as to the August 2015 incident, the clothes being cut off the defendant, that was witnessed by law enforcement. That happening was witnessed by law enforcement, and there are hospital witnesses as well who saw that happen. These were bloody clothes from someone who had just been shot.

Those were maintained, as it says in the affidavit, and eventually turned over to a forensics technician. The blood was swabbed on there. I do believe it was submitted to the Department of Forensic Science. So it was used to further the shooting investigation. There was an arrest made in the shooting investigation.

The defendant was questioned in late September of '15 regarding the shooting incident. Now, at that point, of course, they knew they had found crack cocaine in the pants in question. So they did -- the police did Mirandize him. But the purpose of the interview was really to talk to him about the shooting.

They obtained information regarding who the shooter was, and, indeed, the shooter had been arrested. Interestingly, I will note for the Court when it came time for the defendant to testify against the shooter, he declined, and a number of the shooter's charges have been nolle prosequi as a result of that.

11:00:1 11:00:1 11:00:2 11:00:3 11:00:3 11:00:4 11:01:0 11:01:0 11:01:1 11:01:1 11:01:1 11:01:2 11:01:2 11:01:3 11:01:3 11:01:4 11:01:4 11:01:5 11:01:5 11:01:5 11:02:0 11:02:0 11:02:1 11:02:4 11:02:5

But there was an investigation into the shooting, rather extensive. One canvassed the neighborhood, speak to witnesses, that sort of thing. This was not -- the cutting of the pants off the defendant and turning it over to a forensics technician, this was not something that was, you know, just done to try to get a free search, if that's the defense's concern.

THE COURT: Why was the defendant shot?

MR. HUDSON: So the defendant claims that he knew his shooter but that they had never had trouble before. I will note for the Court that when the shooter was found by police, he had not only the gun that matched the description of the gun everyone gave, including the defendant, and the description of the face mask that everyone gave, too, he also had drugs with him. So the belief is that it is a drug-related shooting.

MS. KATCHMAR: I would object. That is purely speculation, sir.

THE COURT: Well, hold on a second.

MR. HUDSON: Yes, sir.

THE COURT: I'm asking for a factual proffer --

MR. HUDSON: Yes, sir.

THE COURT: -- as to the circumstances surrounding what appears to be an extraordinarily violate event involving this defendant. If you have information, I'd like to hear

11:03:5 11:04:0 11:04:1 11:04:1 11:04:2 11:04:3 11:04:3 11:04:4 11:04:4 11:04:5 11:05:0 11:05:0 11:05:1 11:05:1 11:05:1 11:05:2 11:05:2 11:05:2 11:05:3 11:05:3 11:05:3 11:05:4 11:05:4 11:05:4 11:05:4

it. Now, if the police have a theory, and it's just a theory, I can hear that, too. But I'll take it for what it's worth because, obviously, apparently there is no prosecution, at least now, on it. But, you know, I'm looking at -- you all know what questions I'm looking at.

MR. HUDSON: Yes, sir.

THE COURT: Not the least of which is danger to the community, and the risk of danger posed by the defendant's release. I have a defendant who has been shot.

MR. HUDSON: Yes, sir.

THE COURT: Obviously, I'm interested in that to determine whether or not the fact that he was shot once presents a risk. Perhaps it could happen again. So I'm asking for information.

MR. HUDSON: Yes, sir.

THE COURT: If you have it, great. If the police have a working theory, and all it is is a theory, that's okay. I'll take it for what it's worth. But I need to evaluate --

MR. HUDSON: Yes, sir.

THE COURT: -- what risks there are in considering the defendant's release.

MR. HUDSON: So what I just offered the Court, I suppose, could be characterized as a theory, but here is what it's based on. It's based on what was recovered from the

shooter when he was arrested by police. It is based on the police's knowledge of both this defendant's background as well as the shooter's background. The police have information that the shooter is involved in a gang, I'm told, and that this was -- I don't know how much detail the Court wants me to go into as to how witnesses say the shooting occurred.

THE COURT: Well, that's enough, Mr. Hudson. I understand what the Government's operating theory is. It was the Government's belief that it was a drug-related conflict?

MR. HUDSON: Yes, sir, based on -- yes. Yes, sir.

THE COURT: All right. In other words, he wasn't in a 7-Eleven and somebody came in to rob it and he was the --

MR. HUDSON: No, sir.

THE COURT: -- and the victim standing there who got shot by an aggressive robber?

MR. HUDSON: It was car comes into the neighborhood, shooter gets out, shoots defendant, quickly gets back in car, leaves neighborhood. That's how it occurred, sir.

THE COURT: All right.

MR. HUDSON: Other than that, I have only argument.

THE COURT: All right. Well, don't sit down.

MR. HUDSON: Yes, sir. Of course. I'm sorry.

THE COURT: Let me hear your argument. Go ahead. Let me hear your argument.

MR. HUDSON: Yes, sir. Of course. Okay. Well, there are a number of reasons why the defendant should be detained pending trial. Of course, start with the presumption. Second, the defendant has a terrible criminal history, as the Court can see from the pretrial services report. He's an eight-time felon. All except one of those are drug trafficking felonies.

The Government anticipates that as such he will qualify as a career offender for sentencing guidelines purposes, and with a rap sheet that goes back to 1999 as an adult. And the Court can see from the pretrial services report, it goes back even further than that, actually, prior to him being an adult. It just is not unfair at all to characterize this defendant as a career offender.

On the offensive reasoning before the Court today, he ran from law enforcement that evening, and he evaded capture for nearly two months on state drug charges stemming from that event. His criminal record is riddled with offenses like failure to appear, he has several of those; refusal to identify himself to law enforcement; resisting arrest; and a number of show causes.

So in terms of not running from law enforcement, showing up to court, following the Court's orders, this defendant has shown over and over again consistently that he doesn't do so well with those things. And now he's facing 20

11:09:2 11:09:2 11:09:2 11:09:2 11:09:3 11:09:3 11:09:3 11:09:4 11:09:4 11:09:4 11:09:5 11:09:5 11:09:5 11:10:2 11:10:3 11:10:3 11:10:4 11:10:5 11:12:0 11:12:0 11:12:1 11:12:1 11:12:2 11:12:3 11:12:3

years in prison and career offender status, the government

does not believe that that will increase the chances that he

will show up for court and follow this Court's other orders,

which, of course, as the Court knows, following the Court's

orders is a key part of whether bond is appropriate under the

Bail Reform Act of 1984.

As to danger to the community, of course, it's in

the pretrial services report that the defendant has lived in

this area his whole life, has lots of family and friends

here, but the problem is that he's also been running afoul of

the law in this community as an adult since 1999.

His convictions, in addition to the drug trafficking

felonies, the numerous drug trafficking felonies, include

assault and battery, and I would note that there is -- those

are seven different offense dates, maybe two sentencing

events for the seven drug felonies, but it is separate

offense dates for each one. So we are now on drug dealing

incident number eight here today.

In February 2013 the defendant was given a suspended

sentence on five of the drug trafficking felonies. Less than

a year later, January 2004, still on probation, still under a

suspended sentence, he's arrested again for a drug

trafficking felony. And despite the circumstances, he's let

out on bond and a month later, in February 2004, now under

probation, now under a suspended sentence and on bond, too,

he's arrested for another drug trafficking felony. This time when he's sentenced for those offenses in 2005, I believe the pretrial services report indicates that he got a total of six years in the state penitentiary. By my rough calculation, I guess that means he got out of the penitentiary in about 2012 or 2011, and he is caught trafficking in crack cocaine again. Again we are on charge number eight. In February of 2014, the Court heard evidence today that one of the witnesses we have is able to place this defendant selling crack cocaine back into 2012.

So, in short, he is re-offending, and, of course, on this 2014 incident, this February 2014 incident, he runs from police and isn't apprehended for two months. When he was apprehended in April of '14, he was given bond, and the Government would point out that just as he had done every time before, in both the 2003 and the 2005 drug dealing arrests, he fails to live up to the bond that the state court placed him on. He's caught dealing crack cocaine again leading to his September 2015 arrest.

Now, if the years in the penitentiary didn't dissuade him from selling drugs, the prior bonds he was given obviously didn't dissuade him from selling drugs, and the Government is just very doubtful that any combination of bond conditions would dissuade him from continuing to sell drugs now.

He's shown through his own conduct consistently that when it comes to selling drugs, he is a consistent and ongoing danger to the community, and the Government would respectfully submit that there doesn't appear to be a reason that giving him a third chance today would bring about different results than in the past. I say a third chance based on the fact he was arrested in 2014, given a bond in 2014, and he's found with crack again in 2015.

So he's already been given some chances before, and, of course, his prior incidents, as well, he's been caught selling drugs while out on bond. As the Court noted, the complaint does not represent everything the defendant could be charged with. As was indicated in the testimony today, of course, the trafficking of drugs goes as far back as 2012. He's been seen in possession of two kilograms of cocaine, as well as guns, as well as a picture of a gun on his phone, as well as large sums of cash consistent with what the cooperating witness told Detective Thomas.

And one other point of corroboration I would offer, while I'm thinking of it, on that cooperating witness, the Government elicited testimony from a Detective Thomas that this cooperating witness indicated that he not only was a drug user but that he became involved in selling crack cocaine with this defendant. He made statements against his penal interest, and I would submit to the Court that he was

quite forthcoming with the detective, and that does go to his credibility and that that weighs in his favor when it comes to his credibility. He is making statements against his penal interest and being open and honest with the detective. 11:18:2 11:18:3 11:18:3 11:18:4

The other thing I'll mention, and I believe it's mentioned in the affidavit anyway, after the August of 2015 incident, the shooting incident, a personal friend of the defendant did tell police, yes, I'm a drug dealer. 11:18:4 11:18:5 11:18:5 11:19:1

I will end it this. The Government has what I believe is ten good reasons to detain this defendant: Number one, I would submit to the Court that the evidence is strong. We've got drugs on the table. This is not a historical case. Number two, we've got law enforcement witnesses on both the February of '14 and the August of '15 incident. Number three, we've got a presumption against bond. Number four, even if we didn't have the presumption, for the reasons the government has explained, this defendant poses a substantial risk of nonappearance and a danger to the community. Number five, he's an eight-time felon, seven of them drug trafficking felonies. Six, history of failure to appear. Seven, history of failing to abide by Court orders. Eight, history of breaching bond conditions. Nine, the probation is recommending detention. Ten, that probation did not find the two possible third-party custodians to be suitable. 11:19:2 11:19:3 11:19:3 11:19:4 11:19:4 11:19:5 11:19:5 11:20:0 11:20:0 11:20:1 11:20:1 11:20:2 11:20:2 11:20:3 11:20:3 11:20:3

And number eleven, I'll add, as the Court pointed 11:20:4

out, this is a defendant who at a minimum has drawn violence, and we believe on a drug-related incident in the 2015 -- in the August of 2015 instance or been involved in a drug-related shooting, the Government believes. We recognize it was on the victim side of things, but, still, it's generated violence.

So in summary, got a lot of past conduct with crime shows that this is the type of defendant who can't be trusted to abide by a Court's order, whether it's bond, whether it's probation, whether it's a suspended sentence, and for any of those reasons alone, but definitely for all of them combined, the Government would ask the Court to keep this defendant detained pending his trial.

THE COURT: All right. Thank you, Mr. Hudson.

MR. HUDSON: Yes, sir.

THE COURT: Ms. Katchmar, your turn.

MS. KATCHMAR: Thank you. Understanding that I may be swimming a little bit upstream, Your Honor, I still believe that we can put forth conditions or a combination of conditions that will reasonably assure his appearance and allay some of the Court's concerns regarding danger to the community. We understand that that is probably foremost the Court's concern along with the presumption. We would first note that the number of felonies that the Government alleges were not in eight separate instances but they were in

combined events where several charges were put forth.

So we actually have a 2002 to -- excuse me, 2003 -- that's right, 2003, 2001 and a 2005 event which leads to all of these events as it relates to drug-related convictions, Your Honor.

He is on supervision for at least, I believe all of those items still, based upon the pretrial report. Your Honor, he is, as the Court has pointed out, as you know, the defense will point out, that he is, in fact, presumed innocent constitutionally, that the presumption is a statutory creation by the Bail Reform Act, and that he is a lifelong resident of this area.

Not only does his mother live in the house where it was -- where she was deemed not to be an appropriate third-party custodian, based upon her criminal convictions, there is nothing indicating that she is failing to follow the rules of the Court or that she would refuse to follow the rules of this Court if she were a third-party custodian. And she is present in here today.

She also lives there with Teisha Goffigan, who I've already pointed out, the sister of Mr. Goffigan. She is -- I believe she works for an asphalt and concrete company as a foreperson, and she also actually is an R.N., if I'm not mistaken, registered nurse also but not by trade now. Their home is a family home. It's owned. It's in an area that can

be looked into.

What I would point out is that there is the shooting in August 2015, which we understand is of concern to the Court, that it drew violence, but we don't have anything before or after suggesting otherwise -- excuse me, suggesting this violence. We have a situation where he was at his home. He was easily found.

If the house had been searched and drugs and drug paraphernalia and drug trafficking items had been found in September -- on September 24th, 2015 when he had been arrested, I assure you that would be before the Court. It's not.

Your Honor, he has never been charged federally. I do believe federal is different. The penalties are different. People know you just can't run from the Federal Government. It's everywhere.

So I do believe that there are a series of conditions. He is not working, so there is no reason why he shouldn't be at his home at all times. The family is willing to do electronic monitoring and whatever other monitoring GPS that the Court deems appropriate.

He still needs medical care. He's, as the report indicates, he's still suffering side effects from that. He is still on probation. He would have to follow those terms and conditions along with the pretrial officer. There is no

11:26:3 11:26:3 11:26:3 11:26:3 11:26:4 11:26:5 11:26:5 11:27:0 11:27:0 11:27:1 11:27:1 11:27:1 11:27:2 11:27:2 11:27:2 11:27:3 11:27:3 11:27:4 11:27:4 11:27:4 11:27:4 11:27:5 11:27:5 11:28:0 11:28:0

substance abuse history. It sets that there was back way early up to 2000, but we are 16 years from that, so there is no history of that.

No mental health history whatsoever. So in terms of any of that, those services would not be needed. Would he have to go and look for a job, we would assert that is probably a good idea for him, but also seeking the medical care is also a good idea.

Your Honor, the family is here. There is nothing to show that they don't follow the terms and conditions. Mr. Goffigan is very aware, based upon his conversations with counsel and hearing Mr. Hudson, what potential consequences he could face and is potentially facing. But that alone is not enough to create a presumption that he should be incarcerated. We understand that the state kept him in custody but the state has different resources.

THE COURT: The presumption is created by statute. It's not created by the underlying facts.

MS. KATCHMAR: Understood. It's based upon the nature of the charge that he's facing and the potential penalty that he could face from that charge, and we understand that, Your Honor. But that alone, that presumption can be rebutted by reasonable, reliable information, even a scintilla of which the defense has presented. So we would assert that based upon the

information we have provided, that combination of conditions that could reasonably ascertain his appearance here in court, that we request the Court to release him on the GPS, on the home monitoring to the address where he's lived predominant and all of his life since 1980, and that any other terms and conditions the Court deems appropriate, he will such follow. Thank you.

THE COURT: Thank you, Ms. Katchmar.

All right. Well, as the Court has hopefully made clear, that the purpose of this proceeding is certainly not to adjudge guilt or innocence of the defendant, but, rather, to determine whether there is any condition or combination of conditions that the Court could impose that would assure his appearance at trial and protect the community.

The statute under which he was charged makes this a presumption case. By that it means that Congress has presumed that people charged with this statute should be detained because there are no conditions the Court can impose, but that presumption can be rebutted.

The defendant has proffered, to rebut that presumption, the fact that his criminal conviction history, let's just say is overstated because it involved less incidents that the Government, in their argument, has separated out.

They have proffered that the defendant abided,

theoretically, to an extent his probation. He didn't flee the jurisdiction when he was placed on probation in April of 2014, although the Government notes that when he was arrested in 2015, it was because of drugs that were found on him following his incident where he had been shot.

The defendant has proffered conditions that could be imposed remanding him to his mother as third-party custodian in the home in which she lives with her daughter, the defendant's sister. The problem is probation has made it, not binding on the Court, but the probation has found that the defendant's mother would not be a suitable custodian and the home would not be a suitable location. And under these circumstances, the Court is compelled to find that the presumption has not been rebutted, that the nature of this offense and the meager assurances the Court can have that the defendant would abide by any conditions the Court could impose is just not sufficient to rebut the presumption.

In looking at the factors, these are very serious charges. The weight of the evidence is significant. The defendant's criminal record is, regardless of whether the convictions are aggravated or not, is extensive, and it involves similar offenses, and it involves offenses while the defendant was either on probation or otherwise on supervision or, in the case of the most resent ones, while he was on bond. There are a number of failures to appear. There are a

11:31:5 11:31:5 11:32:0 11:32:0 11:32:1 11:32:1 11:32:1 11:32:2 11:32:2 11:32:3 11:32:3 11:32:4 11:32:4 11:32:5 11:32:5 11:33:0 11:33:0 11:33:1 11:33:1 11:33:1 11:33:2 11:33:2 11:33:3 11:33:3 11:33:3

number of convictions for failure to be of good behavior. So that tells the Court the defendant is not likely to follow conditions or combinations of conditions.

Finally, because of the nature of these charges, the shooting that happened in August of this past year, the danger to the community posed by the defendant's release is substantial. So I'm going to grant the Government's motion for detention. I'm going to issue a written order outlining the basis therefor. And unless there is anything further --

MR. HUDSON: There is one further thing, Your Honor. Ms. Katchmar and I have both signed an order for discovery. We would ask the Court to consider that and consider entering it.

MS. KATCHMAR: That is correct, Your Honor. Thank you.

THE COURT: All right.

MS. KATCHMAR: And nothing further from the defendant.

THE COURT: All right. The order has been signed by the parties, so I will enter that.

MR. HUDSON: Thank you, sir.

THE COURT: And as part of my order, I will also formalize the probable cause finding. All right.

MS. KATCHMAR: Thank you.

THE COURT: All right. Thank you, ladies and

gentlemen. The Court will stand in recess. 11:35:3

(Hearing adjourned at 11:12 a.m.) 11:35:3

CERTIFICATION

I certify that the foregoing is a correct transcript, to the best of my ability, of the court's audio recording of proceedings in the above-entitled matter.

X________________/s/______________________x

Jody A. Stewart

X_____5-24-2016_________x

Date