IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 2:16-cr-34 |
| QUINN AUSIDI GOFFIGAN, | ) | |
| | ) | |
| Defendant. | ) | |

### SENTENCING POSITION OF THE UNITED STATES

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, and Kevin Hudson, Assistant United States Attorney, hereby submits its position with respect to the sentencing factors for defendant Quinn Ausidi Goffigan. The government had made one objection to the Presentence Investigation Report ("PSR"), specifically that the defendant did not work "under the table" for Timothy Phelps and Teresa Pasto between 2011 and 2015, as described in paragraph 122 of the PSR. Upon further investigation, the government now withdraws that objection. As such, the government now has no objections or corrections to the PSR. For the reasons set out below, the government respectfully recommends that the Court sentence the defendant to three hundred sixty months in prison, which is the bottom of the guidelines range, but is also the statutory maximum. In this case the guidelines range exceeds the statutory maximum.

### **MOTION**

The United States moves this Court, pursuant to U.S.S.G. § 3E1.1(b), to grant an additional one-level reduction in the offense level for acceptance of responsibility. The defendant assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the

1

United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

## BACKGROUND

On March 9th, 2016 the federal grand jury sitting in Norfolk returned a two count indictment against the defendant (Document 12). Both counts of the indictment charged the defendant with possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). A superseding indictment returned by the grand jury on April 6th, 2016 added a third count—conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846 (Document 16). On April 26th, 2016, following the government's filing of an information to establish a prior conviction under 21 U.S.C. § 851, the defendant pled guilty to count two of the superseding indictment (Documents 18, 20-22).

## UNRESOLVED OBJECTIONS

The defendant has made five objections to the presentence report. First, the defendant objects to the role enhancement he received pursuant to U.S.S.G. § 3B1.1(a) for being an organizer/leader in an offense that involved five or more participants. The defendant's second objection is to the difference in marijuana equivalency ratios between cocaine base and cocaine. The defendant's third objection is to the firearm enhancement pursuant to U.S.S.G. § 2D1.1(b)(1). The defendant's fourth objection is to the enhancement under U.S.S.G. § 2D1.1(b)(2) for directing the use of violence. The final defense objection is to a reference to accusations of domestic violence set out at paragraph 111 of the PSR. The government will address each objection in turn.

I. Drug Ratios

While Courts that are so inclined can grant a variance based on disagreement with the

drug ratios set out in the guidelines, for purposes of properly calculating the guidelines the applicable ratio is still the one listed in U.S.S.G. § 2D1.1. Kimbrough v. United States, 552 U.S. 85, 91 (2007) ("under Booker, the cocaine Guidelines, like all other Guidelines, are *advisory only*…"). Even after Booker and Kimbrough, the first step at a sentencing is to calculate the correct guidelines range. See, e.g., United States v. Diosdado-Star, 630 F.3d 359, 365-66 (4th Cir. 2011). After doing so, the Court may select a sentence outside the correctly calculated guidelines range and the Court may base that deviation on the guidelines' departure provisions or any other factor as long as the Court adequately justifies it. Id. A correct calculation of the applicable guidelines, however, still requires the use of the drug ratios set out in U.S.S.G. § 2D1.1, even if the Court ends up deviating from the correctly calculated guidelines in imposing sentence based on a disagreement with the drug ratios.

The drug ratios set out in the guidelines are approved by Congress. Where a Court grants a variance under Kimbrough, it does so based on a determination that the base/hydrochloride disparity yields a sentence greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a). Kimbrough, 552 U.S. at 110 (a District Court may vary a defendant's sentence upon concluding that "the crack/powder disparity yields a sentence greater than necessary to achieve § 3553(a)'s purposes"). The Fourth Circuit, as well as other federal appellate Courts, have repeatedly rejected challenges to the sentencing disparity between cocaine hydrochloride and cocaine base. See, e.g., United States v. Bullard, 645 F.3d 237, 245-46 (4th Cir. 2011) (statutory sentencing disparity between cocaine hydrochloride and cocaine base does not violate equal protection or due process); United States v. Hayden, 85 F.3d 153, 157-58 (4th Cir. 1996) (rejecting argument that Congress's decision to punish cocaine base more severely than cocaine hydrochloride lacks a rational basis and citing cases from the First, Second, Third, Fifth, Sixth, Seventh, and Eighth

Circuits upholding the sentencing disparity). The Fourth Circuit, in particular, has consistently recognized that cocaine base could be considered "a greater menace to society than distribution of cocaine powder…it is less expensive and, therefore, more accessible…it is considered more addictive than cocaine powder and…it is specifically targeted toward youth." Id. quoting United States v. Thomas, 900 F.2d 37, 39-40 (4th Cir. 1990).

In addition to being highly addictive, readily available, and a driver for other types of crime, cocaine base use and addiction destroys lives and destroys families. Cocaine base dealers like the defendant reap the rewards of easy money off the backs of users with broken lives. The defendant himself experienced this growing up, yet he would put other families through the same trials and tribulations for a quick dollar (Document 28, ¶¶ 105, 107). Of course, the Court has the power to deviate categorically from the properly calculated cocaine base guidelines based on policy disagreement. Spears v. United States, 555 U.S. 261 (2009). In a case like this, however, where the defendant was fully aware of the havoc he was bringing to so many people and their families, the Court should not choose to deviate from the guidelines.

II.     Role Adjustment

The PSR gives the defendant a four level increase for being an organizer or leader of a criminal activity involving five or more participants pursuant to U.S.S.G. § 3B1.1(a). In determining whether a defendant meets the criteria for being a leader or organizer, the Court should consider such factors as: (1) the exercise of decision making authority; (2) the nature of the participation in the offense; (3) the recruitment of accomplices; (4) the claim to a larger share of the proceeds; (5) the degree of participation in planning or organizing the criminal conduct; (6) the nature and scope of the criminal conduct; and (7) the degree of control and authority exercised over others. United States v. Sayles, 296 F.3d 219, 224 (4th Cir. 2002) (citing

4

U.S.S.G. § 3B1.1, cmt. n. 4). Role determination is not only based on the defendant's role in the offense of conviction, rather it takes all relevant conduct into account. United States v. Houdersheldt, 395 Fed.Appx. 66, 68 (4th Cir. 2010). The defendant easily meets the above criteria for being a leader or organizer. Furthermore, the criminal activity in this case, excluding the defendant, involved seven people. But see United States v. Fells, 920 F.2d 1179, 1182 (4th Cir. 1990) (defendant himself should be counted among the participants under U.S.S.G. § 3B1.1).

The government anticipates that the evidence at sentencing will show that UCC #1, who is referenced in the PSR, was selling cocaine base for the defendant. United States v. Puzey, 73 Fed.Appx. 549, 553 (4th Cir. 2003) (affirming role increase where, among other factors, defendant had people act as runners). The PSR mentions that UCC #1 and the defendant were often together when UCC #2 purchased cocaine base from UCC #1 (Document 28, ¶ 12). Further, the defendant bragged that he cooked the cocaine base that UCC #2 was buying from UCC #1. The evidence at sentencing will also show that when UCC #2 felt that UCC #1 was attempting to take advantage of UCC #2 on cocaine base pricing, leading to a falling out between UCCs #1 and #2, the defendant immediately called UCC #2 to inquire about what happened. Thereafter, the defendant told UCC #2 that UCC #2 could just deal directly with him.

Eventually, the defendant began having UCC #2 operate in the same capacity as UCC #1 did. United States v. Lara, 546 Fed.Appx. 189, 190 (4th Cir. 2013) (affirming role increase where, among other factors, defendant recruited accomplices). The PSR shows that UCC #2 made drug runs for and sold drugs on behalf of the defendant (Document 28, ¶¶ 18, 19, 27). The evidence at sentencing will further show that UCC #2 had to give the money made selling crack for the defendant back to the defendant. Puzey, 73 Fed.Appx. at 553 (affirming role increase

5

where, among other factors, defendant received the largest share of the drug proceeds). In fact, UCC #3 told UCC #2 that if UCC #2 did not have the defendant's money right, UCC #2 would have to "deal with" UCC #3. United States v. Henley, 360 F.3d 509, 517 (6th Cir. 2004) (affirming three point role adjustment where defendant used enforcers to intimidate those who owed him money). Oftentimes UCC #2's only compensation was that the defendant would provide him cocaine base to use. UCC #2 would also drive the defendant around while the defendant sold cocaine base. At one point the defendant invested money in a company run by UCC #2, but the defendant did not get a return on his investment because UCC #2's company was not doing very well due to UCC #2's use of crack cocaine. After the defendant did not get the return on his investment, the defendant began to use that fact as leverage to assert tighter control over UCC #2. United States v. Cameron, 573 F.3d 179, 184 (4th Cir. 2009) (role increase appropriate "where the evidence demonstrates that the defendant controlled the activities of other participants…").

UCC #3 also began taking on some of the same responsibilities under the defendant as UCCs #2 and #1. The PSR indicates that UCC #3 told UCC #2 and other cocaine base users that if the defendant was unavailable, they could contact UCC #3 to buy drugs (Document 28, ¶ 26). The evidence at sentencing will show that UCC #2 later took UCC #3 up on this when UCC #2 could not find the defendant. The PSR further references UCC #3's involvement in a crack cocaine-related robbery and the crack cocaine-related homicide of UCC #4 (Document 28, ¶¶ 28 and 32). See, e.g., United States v. Clark-Thomas, 478 Fed.Appx. 568, 570 (11th Cir. 2012) (two level role increase affirmed where defendant planned to use two to four associates to assist in committing a drug-related robbery).

Some of the circumstances of the homicide are set out in the PSR (Document 28, ¶ 32).

As the PSR indicates, UCC #4 was yet another drug runner for the defendant, much like UCCs #1, 2, and 3. UCC #4 had contacted the defendant's cocaine source about some cocaine UCC #4 had lost while trying to convert the substance to cocaine base. As a result, the source made the defendant responsible for the debt resulting from the loss of that cocaine. Thereafter, UCC #3 murdered UCC #4. Further, UCC #3 texted yet another person just after the murder of UCC #4, from UCC #4's phone, to tell this other person that he would be next. Indeed, this other person left the commonwealth for a period and only returned upon learning that UCC #3 had been killed. This other person and UCC #4 were good friends and both were involved in drug distribution. If the circumstances of UCC #4's murder were not indicative enough of retaliation, the defendant was to meet UCC #3 at a 7-Eleven to provide UCC #3 payment just two weeks later. It was at that time that UCC #3 was killed at the 7-Eleven while exchanging gunfire with the police. Police recovered a firearm from UCC #3, which matched the ballistics associated with the murder of UCC #4.

As to the robbery, the government anticipates that the evidence will show that there was a home on Hillswick Road in Virginia Beach where the defendant was, at one time, selling cocaine base. The defendant stopped selling at that location after the homeowner there was arrested. After that point, the defendant called UCC #2 and asked how much business was being done at the Hillswick Road house. UCC #2 frequently went to the Hillswick Road house to consume crack cocaine. A few days after the defendant made that inquiry, UCC #2 was at the Hillswick Road house when the defendant and UCC #3 showed up. The defendant spoke to people in the kitchen of the house while UCC #3 went upstairs and robbed the new source of supply of both drugs and money at gunpoint. Once UCC #3 came downstairs, UCC #3 and the defendant quickly left.

There was another robbery not mentioned in the PSR. On August 17th, 2015, seven days after the defendant was shot, there was a home invasion robbery at the home of a woman associated with the man who shot the defendant on August 10th, 2015. The man who shot the defendant on August 10th, 2015 was a drug dealer in competition with the defendant. The masked men who invaded the home, one of whom was UCC #3, shot the woman in the face and stole some pills from the house. The aforementioned firearm recovered from UCC #3 matched the ballistics associated with this shooting, as well. This fits the pattern of yet another act of violence in retaliation for acts committed against the defendant. Perhaps one of these events, standing alone, could be dismissed as a coincidence. This number of events in this short a period, all of which the defendant would have a strong motive to be involved with, could not possibly be a coincidence unlinked to this defendant.

Aside from those listed in the PSR, the defendant directed three other people in furtherance of his crack cocaine trafficking activities. The defendant directed a fifth person, to whom the government will refer as UCC #5, to find him a source of supply for four and a half ounces of cocaine. United States v. Zanders, 410 Fed.Appx. 700, 702 (4th Cir. 2011) (affirming role increase where defendant directed the activities of co-conspirators). The defendant showed UCC #5 money and told UCC #5 that he was ready to do the deal now. UCC #5 found the defendant a sixth participant, to whom the government will refer as UCC #6, who sold the defendant four and a half ounces of cocaine. The defendant only paid UCC #5 $200 for facilitating the deal. The defendant then asked UCC #6 if he could cook cocaine in cocaine base on UCC #6's stove. UCC #6 agreed, albeit reluctantly. The seventh person the defendant directed and organized, Christina Igartua, was recently convicted of a drug conspiracy in the Virginia Beach Circuit Court. She also did drug runs for the defendant.

8

III.    The Firearm Enhancement

The defendant objects to receiving a firearm enhancement under U.S.S.G. § 2D1.1(b)(1). The application notes to U.S.S.G. § 2D1.1(b)(1) provide that:

> The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

The Fourth Circuit has also addressed the firearm possession enhancement and its cases provide some guidance on when the application of the enhancement is warranted. Compare United States v. Moseley, 626 Fed.Appx.399, 402 (4th Cir. 2015) (enhancement appropriate where a 9mm handgun and magazine were found in the bedroom of the same home where the defendant committed his drug offense) and United States v. Manigan, 592 F.3d 621, 631-32 (4th Cir. 2010) (enhancement affirmed where two handguns were seized from the defendant's residence, which was the focal point of defendant's drug activity) and United States v. Harris, 128 F.3d 850, 852-53 (4th Cir. 1997) (enhancement appropriate where unloaded firearm was found in the same drawer as the drugs at issue) with United States v. Duffy, 30 Fed.Appx. 240, 249-50 (4th Cir. 2002) (enhancement not warranted where guns were found at defendant's home a year after the conspiracy ended, but drugs were only sold at defendant's business, where no guns were found) and United States v. McAllister, 272 F.3d 228, 234 (4th Cir. 2001) (enhancement inappropriate where the evidence failed to show the circumstances of the firearm possession). The Fourth Circuit has noted that the firearm possession enhancement "does not require proof of precisely concurrent acts, for example, gun in hand while in the act of storing drugs, drugs in hand while in the act of retrieving a gun." Harris, 128 F.3d at 852 (quoting United States v. Johnson, 943 F.2d 383, 386 (4th Cir. 1991)). See also Manigan, 592 F.3d at 629 (for the same proposition).

9

Rather, "the Government must prove by a preponderance of the evidence that the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." Manigan, 592 F.3d at 628-29. The government need not show that the defendant himself possessed a firearm, rather it is sufficient to show that it was reasonably foreseeable to the defendant that his co-conspirator would possess a firearm. United States v. Marby, 576 Fed.Appx. 155, 156 (4th Cir. 2014) (citing United States v. Kimberlin, 18 F.3d 1156, 1159-60 (4th Cir. 1994)).

In this case, the facts warrant the firearm enhancement under U.S.S.G. § 2D1.1(b)(1) using both theories. Paragraph eleven of the PSR indicates that the defendant possessed a firearm while converting cocaine to crack cocaine and while counting large sums of cash. At the time, the defendant was a multiple-time convicted felon, making carrying a firearm a substantial risk. The reason the defendant would take such a risk is that drug dealing is an especially dangerous business. See United States v. Brockington, 849 F.2d 872, 876 (4th Cir. 1988) (distribution of drugs, and the commonsense recognition that drug dealing is a dangerous and violent enterprise, support an inference that a defendant's possession of a firearm as to facilitate drug dealing).

The PSR further details a robbery and a homicide, both of which were accomplished through the use of a firearm. As discussed above, the robbery and the homicide were related to the defendant's cocaine base dealing activities and directly benefitted the defendant, though the defendant himself was not the triggerman (Document 28, ¶¶ 28 and 32). As such, whether under the theory that the defendant himself possessed a firearm connected to his drug offense or under the theory that a co-conspirator possessed a firearm under the same circumstances, the defendant should be given the firearm enhancement under U.S.S.G. § 2D1.1(b)(1).

IV.    Directing Violence

As explained in detail above and as the evidence at sentencing will show, this defendant's co-conspirator, UCC #3, has committed a homicide and two armed robberies. The timing of each of these violent acts is strongly indicative of retaliation linked to the defendant's drug dealing activities. Further supporting the conclusion that the defendant directed those three acts of violence is the fact that another drug dealer rival of the defendant's received a message following the murder of UCC #4 that he would be next.[1] In addition, the evidence at sentencing will show that the defendant contacted UCC #5 and asked UCC #5 to "take care of someone" for him. UCC #5 interpreted this to mean that the defendant was asking UCC #5 to kill someone for him, which UCC #5 declined to do. Any one of these incidents would suffice to earn the defendant the directing violence enhancement under U.S.S.G. § 2D1.1(b)(2). The government would submit that the combination of all five events described above means that the addition of just two points for directing violence grossly underrepresents the gravity of the violence linked to this defendant.

V.    Defendant's Objection to the Abuse Allegation

The defendant objects to the reference to the emergency protective order and the abuse allegations through which his former wife obtained that protective order, as set out in paragraph 111 of the PSR. As a threshold matter, this objection is not one the Court will have to resolve at the sentencing hearing, as it does not change on the guidelines calculation. See Fed. R. Crim. P. 32(i)(3)(B). The government also does not seek to use the abuse allegations in its argument. Further, the government would submit that the Probation Officer has made quite clear where the

---

[1] This is further described on page six of this position paper.

allegations came from and in what context. See 18 U.S.C. § 3661 (placing no limit on the background, character, and conduct information the Court may receive and consider for sentencing). As such, the Court may attach whatever weight it sees fit to the information set out in paragraph 111.

## POSITION ON SENTENCING AND ARGUMENT

Following the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), a District Court imposing sentence engages in a multi-step process. "A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." United States v. Green, 436 F.3d 449, 456 (4th Cir. 2006) (quoting United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005)). As to findings of fact, the party objecting to those findings in the PSR has a burden to come forward with an affirmative showing to the contrary. United States v. Love, 134 F.3d 595, 606 (4th Cir.), cert. denied, 524 U.S. 932 (1998). Courts next determine whether a sentence within that guideline range serves the factors set out in 18 U.S.C. § 3553(a). If not, the Court should select a sentence that does serve the § 3553(a) factors. Green, 436 F.3d at 456. The Court must also articulate its rationale for selecting a particular sentence, especially where that sentence is outside the applicable guidelines range. Id. Accord United States v. Helton, 782 F.3d 148, 152 (4th Cir. 2015) (citing Green). The government has already discussed the proper calculation of the applicable guidelines range in the unresolved objections section above, therefore the government will focus here on the § 3553(a) factors as applied to this defendant.

The defendant's offense in this case involves his possession with intent to distribute an addictive and dangerous drug. As the government has already mentioned in this position paper, the PSR reveals that the defendant is fully aware of the destructive nature of cocaine base

(Document 28, ¶¶ 104-05, 107). The circumstances of the offense to which the defendant pled guilty cannot, however, be viewed in isolation. 18 U.S.C. § 3661 (placing no limit on the background, character, and conduct information the Court may receive and consider for sentencing); <u>United States v. Falesbork</u>, 5 F.3d 715, 722 (4th Cir. 1993) (recognizing § 3661's broad scope). This offense is, as the PSR shows, only one incident in the defendant's ongoing and longstanding involvement in drug dealing, which has also involved the defendant directing numerous associates. Worse still, as explained herein and as alluded to in the PSR, this defendant can hardly be deemed non-violent. The PSR shows and the evidence at sentencing will show that this defendant has resorted to involvement in violence on numerous occasions to further his drug dealing and keep rival drug dealers, as well as those who have crossed him, in check. This type of violent, drug related retribution has a serious negative impact on the quality of life for those who must, for lack of more resources, live in the neighborhoods on which the defendant and his associates visit their carnage. The longer this defendant spends incarcerated, the longer those neighborhoods have one less obstacle to peace and safety.

As part of the history and characteristics of the defendant, the Court should also consider the defendant's criminal history, which is lengthy and starts so early in life. The government must note that while the defendant's criminal history convictions section takes up sixteen pages of the PSR's thirty-eight pages, the defendant's employment record section takes up approximately one page. The defendant had his first felony conviction at fourteen years old (Document 28, ¶ 53). A year later, the defendant, unlicensed, stole a car in Virginia Beach and ended up getting arrested driving a second stolen car a third of the way across the country, in Indiana (Document 28, ¶ 54). Prior to his eighteenth birthday, the defendant's convictions spanned the gamut of types of crime. He accumulated convictions for property crimes, assault,

13

and sexual assault. These convictions resulted in two commitments to the Department of Juvenile Justice (Document 28, ¶¶ 55-56). The defendant's only offense at age seventeen was a driving offense, but this may be explained by the fact that the defendant spent much of his time as a sixteen and seventeen year old in the DJJ. Even with a juvenile rap sheet longer than many adults' criminal histories, the defendant was only getting started with the above-described conduct.

The defendant's adult criminal history confirms that he is a career offender in the truest sense of the word—not just as a federal sentencing term of art, but in layman's terms, as well. Between his eighteenth birthday and the first time he went to the penitentiary, the defendant had a total of seventeen run-ins with the law (Document 28, ¶¶ 61-79). These included everything from traffic offenses, to failure to appear, resisting arrest, destruction of property, domestic assault and battery, and even suspended sentences for felony drug trafficking. Between age eighteen and age twenty-three, the only year of his life that the defendant did not get in trouble was at age twenty-two.

At age twenty-three, the defendant was sent to the penitentiary for a number of years for doing the very same thing that brings him before this Court—selling crack cocaine (Document 28, ¶ 80). The circumstances of that offense reveal that not much has changed for this defendant over the course of ten years. In the first 2004 incident, police found the defendant using a driver to take him to the location to sell cocaine base. Both times when police approached the defendant in 2004, he ran, just as he did in the 2014 incident at issue in this case (Document 28, ¶¶ 80-81). While running from law enforcement during that second 2004 incident, the defendant tossed a bag of cocaine base away, just as he did in 2014 (Document 28, ¶¶ 19, 81). The defendant spent from age twenty-three to age thirty-one in the Virginia state penitentiary, having

14

been released in December 2011. The defendant's sentence from the Virginia Beach Circuit Court included eleven years of good behavior and supervised probation.

The facts set out in the PSR show that within about seven months, the defendant went right back to doing the thing that kept him incarcerated throughout most of his twenties, selling cocaine base (Document 28, ¶ 10). The defendant consistently engaged in drug distribution until he was finally held without bond following his second drug trafficking related arrest in a seventeen month period, which took place on September 24th, 2015 (Document 28, ¶¶ 31-33). The defendant's conduct to this point not only shows contempt for the Courts that have sentenced him before and the communities where he sells crack cocaine, it also shows that a lengthy sentence in the state penitentiary was inadequate to deter him. If the only effect of spending 2004 through 2011 incarcerated was to keep the defendant from selling cocaine base for seven months following his release, there can be little question that a significantly longer sentence is now warranted.

Taking into account the defendant's persistence in selling drugs even after serving time in the penitentiary for doing so, the defendant's otherwise extensive criminal history, and the numerous acts of violence associated with the defendant's drug trafficking, the government would respectfully urge the Court to sentence the defendant to three hundred sixty months in prison.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:    __/s/ Kevin Hudson_____
Kevin Hudson
Assistant United States Attorney
Virginia State Bar No. 81420
Attorney for the United States
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: (757) 441-6331
Facsimile Number: (757) 441-6689
Email Address: kevin.hudson@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of August 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of the filing (NEF) to all counsel of record.

By:    /s/ Kevin Hudson
       Kevin Hudson
       Assistant United States Attorney
       Virginia State Bar No. 81420
       Attorney for the United States
       101 West Main Street, Suite 8000
       Norfolk, VA 23510
       Office Number: (757) 441-6331
       Facsimile Number: (757) 441-6689
       Email Address: kevin.hudson@usdoj.gov