**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 2:16CR34** |
| | ) | |
| **QUINN AUSIDI GOFFIGAN,** | ) | |
| | ) | |
| **Defendant.** | | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS**

The Defendant, Quinn Ausidi Goffigan ("Mr. Goffigan"), by counsel, in accordance with Section 6A1.2 of the *Sentencing Guidelines and Policy Statements*, as well as this Court's Sentencing Order, hereby represents that he has reviewed the Probations Officer's Presentence Report ("PSR"). Mr. Goffigan has three objections to the report that effect the calculation of the advisory sentencing guidelines. The objection as to the cocaine base-powder cocaine ratio will be addressed under 18 U.S.C. §3553(a)(6).

He hereby addresses the objections and states his position with respect to sentencing factors.

**THE SENTENCE REQUESTED**

Mr. Goffigan is before this Court for sentencing after pleading guilty, pursuant to a plea agreement, on April 26, 2016, to Count Two of the Superseding Indictment charging him with possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The penalty for Count Two has been enhanced pursuant to a Criminal Information filed pursuant to 21 U.S.C. §851. Sentencing is set for September 6, 2016.

For the reasons set forth herein, Mr. Goffigan respectfully asks this Court to impose a sentence below the advisory guideline range. Mr. Goffigan, per United States Sentencing

1

Guideline §4B1.1 has been designated a Career Offender, and as such, after acceptance of responsibility, his advisory guideline range under that section would be 188 to 235 months. However, the PSR calculations pursuant to U.S.S.G. §2D1.1, with enhancements and before rulings on the objections, results in an advisory offense level of 39 (360 months to LIFE), restricted to the statutory maximum of 360 months.

In sum, he is thirty-five years of age and suffered a lifetime of hardship. Practically abandoned as child and bounced around in drug-ridden communities, Mr. Goffigan failed to escape the troubled neighborhoods and find a positive role model. As detailed below, a sentence below the Career Offender advisory guideline range, and the advisory range calculated under §2D1.1, achieves all of the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

## GUIDELINE OBJECTIONS

1. **Firearm**

Mr. Goffigan objects to the two (2) offense level enhancement for the presence of a firearm during the offense, pursuant to § 2D1.1(b)(1). *See* PSR ¶ 42. The probation officer included the enhancement after finding that Mr. Goffigan possessed a firearm during the course of his drug trafficking. Mr. Goffigan contends, however, that there is no reliable evidence that he ever carried or possessed a gun in furtherance of his drug dealing. Furthermore, there is no evidence to support that Mr. Goffigan ever encouraged or directed any of his peers to carry a firearm.

First, paragraph 11 sets forth an allegation that Mr. Goffigan was seen in the presence of a firearm and drugs on at least one occasion. The Government relies on UCC#2 for this information, a several time convicted felon for crimes of moral turpitude including grand larceny, obtaining money by false pretenses, felony probation violations, for which certified copies will be presented at the time of sentencing. Additionally, UCC#2 has a pending matter in state court for another

2

fraud, for which he has requested the Government's assistance. These convictions, along with the lack of corroboration, such as dates, times and locations, call into question the reliability and veracity of UCC#2, on this and other matters.

Second, as another basis, it appears that the probation officer found that such an enhancement is warranted based on UCC#3's possession of a firearm. Under U.S.S.G. § 1B1.3(a)(1)(B), (a)(2), when a defendant is sentenced for a drug offense, his offense level is determined on the basis of his own conduct and that of any co-conspirators, which is done in furtherance of a jointly undertaken criminal activity, whether or not charged as a conspiracy, and is part of the same course of conduct as the offense of conviction. A defendant may receive an enhancement under U.S.S.G. § 2D1.1(b)(1) for a firearm possessed by a co-conspirator if it is not clearly improbable that the weapon was connected with the drug offense. *See United States v. Hunter,* 19 F.3d 895, 896 (4th Cir.1994); *United States v. Falesbork,* 5 F.3d 715, 720 (4th Cir.1993); *United States v. Grier*, 135 F.3d 770 (4th Cir. 1998).

Here, however, UCC#3 was not a participant in the instant offense, nor did Mr. Goffigan and UCC#3 conspire to commit the alleged robbery on Hillswick Road where the firearm was present. *See* PSR ¶ 28. Because UCC#3 never entered into the offense for which Mr. Goffigan was convicted, UCC#3's suspected possession of a firearm is not relevant conduct. Regardless, as recognized in the Government's position on page 7, UCC#2 was present, describing the actions of UCC#3 as independent of Mr. Goffigan, failing to establish knowledge by Mr. Goffigan. Mere presence is not enough.

Third, the Government provides allegations of a retaliatory home invasion and murder by CC#3. Regarding the home invasion, there is no support provided, other than speculative "word on the street" by UCC#5 alleging this event as retaliation for the August 10, 2016, shooting of Mr.

Goffigan. Any actions taken by UCC#3, now deceased, cannot be corroborated as directed by Mr. Goffigan. Therefore, mere chatter by others, rumors and speculation, without more, do not constitute proof, even by a preponderance of the evidence.

Fourth, there is no question it is tragic that UCC#3 killed UCC#4 on August 22, 2015. However, regardless of rumor and speculation, propounded by UCC#5, there is no support that Mr. Goffigan ordered or orchestrated this event. First, Mr. Goffigan was dealing with the attempted murder on his own life. Second, as shown by the Government, UCC#4 went directly to the cocaine source, not Mr. Goffigan. Third, the allegation that the source made the debt Mr. Goffigan's and when, if ever this occurred, has not been substantiated.

Finally, the Government provided information that Brian Goffigan, who was robbed at one point, not the defendant herein, provided a firearm to UCC#3. Brian Goffigan is charged separately, and has been testified to by the investigating agent previously, the separate charges were due to the brothers buying and selling drugs separately, for the most part.

Therefore, this Court should find that Mr. Goffigan is not subject to a two level enhancement under § 2D1.1(b)(1).

**2. Use of Violence**

Mr. Goffigan objects to the two (2) level enhancement for the direction of the use of violence. The argument set forth regarding the firearm is hereby incorporated.

The probation officer included the enhancement after finding that Mr. Goffigan directed UCC #3 to kill UCC#4. However, UCC #3 is a well-known hit man in the community and takes directions from many people. Other than rumor and speculation, there is no support for the allegation that Mr. Goffigan requested UCC#3 to kill UCC#4.

While there may be a text from UCC#3 to the person identified as being the next target after UCC#4, there is no connection that is made between this event and Mr. Goffigan. While UCC#5 asserts that he received a text from Mr. Goffigan requesting assistance to "take care of someone," it should be noted that this text, should it be shown to exist, may just as easily be interpreted as having to do with drug dealing. After all, Mr. Goffigan is a self-admitted drug dealer.

Furthermore, the person referenced in paragraph 34 of the PSR, and identified as "next" by UCC#3, was interviewed by law enforcement officers. This individual confirmed that he has "no beef" with Mr. Goffigan, stating as much to the investigating agent at least three times. Therefore, the Government cannot meet its burden of showing that Mr. Goffigan directed the use of violence. Mr. Goffigan respectfully request that this Court sustain his objection.

3. **Aggravated Role Enhancement**

Mr. Goffigan objects to the four level enhancement applied by the probation officer for aggravated role pursuant to U.S.S.G. § 3B1.1(a). *See* PSR ¶¶ 37, 46.

The Guidelines call for an increase offense level by four levels "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" U.S.S.G. § 3B1.1(a). To be a "leader" the defendant must control others, *United States v. Brown*, 298 F.3d 120 (1st Cir. 2002), whereas an "organizer" coordinates others to facilitate the commission of the criminal activity. *United States v. Picanso*, 333 F.3d 21 (1st Cir. 2003) (wholesale drug dealer was organizer where other dealers regarded him as the "king," and he boasted that he could shut down a co-defendant's distribution if he "messed up again").

According to the PSR, the probation officer applied this four level enhancement after finding that Mr. Goffigan "was an organizer/leader in an offense that involved five or more

participants." PSR ¶ 37. More specifically, it appears that the probation officer asserts that Mr. Goffigan organized/lead UCC#1, UCC#2, UCC#3, UCC#4, UCC#5 and UCC#6, along with Christina Igartua. *See* PSR ¶¶ 10-34. The Government bears the burden of proving that an upward role-in-the-offense adjustment under the Sentencing Guidelines is appropriate, and it must carry that burden by preponderance of the evidence. *United States v. Al-Rikabi*, 606 F.3d 11 (1st Cir. 2010).

Mr. Goffigan objects to the four level enhancement, and submits that a two level enhancement pursuant to § 3B1.1(c) is more appropriate because he was not an organizer or leader of five or more people. Specifically, UCC#3 was a friend of Mr. Goffigan's, not a participant who was criminally responsible for the commission of the instant offense. *See* § 3B1.1, comment. (n.1) ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."). Nor did Mr. Goffigan ever exert any control, influence, or direction over UCC #3.

Upon information and belief, based upon discovery provided, Christina Igartua dealt with Brian Goffigan, not the defendant herein.

While UCC#1, UCC#4 and UCC#5 sometimes dealt with, and bought from Mr. Goffigan, they, on their own, bought and sold drugs for themselves and others. As such, Mr. Goffigan did not control these individuals as the enhancement would dictate.

Furthermore, as outlined in advisory note number four (4) to the §3B1.1, "In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervisor, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of §3B1.1(c)."

U.S.S.G. §3B1.1, comment. (n. 4). In smaller criminal, low-level enterprises, such as is the situation here, a two level role enhancement pursuant to §3B1.1(c) more accurately reflects Mr. Goffigan's role of responsibility and carries out the Commission's intent. Therefore, the defense requests that this Court find that Mr. Goffigan was not an organizer or leader of five or more participants, that the four level enhancement for aggravated role is not warranted, and that a two level enhancement is more appropriate.

In the alternative, should this Court deny the two level role enhancement and find that five or more participants were involved, Mr. Goffigan submits that a three level role enhancement would be more appropriate in the case as opposed to the four level enhancement. Mr. Goffigan maintains that he was not an organizer or leader. In distinguishing a leadership or organizational role from one of mere management or supervision, this Court should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised of others." U.S.S.G. § 3B1.1, comment. (n.4). As noted above, Mr. Goffigan did not exercise control over others, and other participants were free to conduct business when, where, and however they pleased. Therefore, if the Court finds that the two level enhancement does not apply, a three level enhancement, as opposed to a four level enhancement, would be more appropriate here because Mr. Goffigan was, at best, a manager or supervisor, not an organizer or leader.

## THE APPROPRIATE SENTENCE IN THIS CASE

The overriding principle and basic mandate of §3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of

sentencing set forth in Section 3553(a)(2). This requirement is not just another factor to be considered along with the others set forth in Section 3553(a), but instead, "sufficient, but not greater than necessary" sets an independent limit on the sentence.

Accordingly, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing. The law must "tak[e] into account the real conduct and circumstances involved in sentencing" as well as the defendant's personal history and characteristics. *Gall v. United States*, 552 U.S. 38, 54 (2007); 18 U.S.C. § 3553(a)(1). The Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52.

**The Nature and Circumstances of the Offense as They Relate to the Sentencing Factors**

Mr. Goffigan's illegal conduct is explained in the Statement of Facts (ECF No. 22) and the "Offense Conduct" section of the PSR, excluding those facts to which he has objected. In sum, Mr. Goffigan was spotted outside of the Red Roof Inn in Virginia Beach, Virginia, with a bag containing an off-white substance in his vehicle. Law enforcement officers observed Mr. Goffigan hand some of the off-white substance to another man, who then drove away. Mr. Goffigan proceeded to get into his car, but he was subsequently stopped by law enforcement officers. Law enforcement officers observed the bag in Mr. Goffigan's car. Although Mr. Goffigan ran from officers, he eventually turned himself in on the warrant. The bag containing the off-white substance was subsequently submitted to the Virginia Department of Forensic Science, where it tested positive for 4.8126 grams of cocaine base.

Mr. Goffigan admitted to his actions, confirming that he is a self-described drug dealer. Mr. Goffigan has pled guilty and accepted full responsibility. Mr. Goffigan regrets his choices and wants to improve himself and positively contribute to society.

**The History and Characteristics of Mr. Goffigan as They Relate to the Sentencing Factors**

Mr. Goffigan is thirty-five years of age and was born in Virginia Beach, Virginia. Unfortunately, Mr. Goffigan's father left the family when Mr. Goffigan was a young child. In fact, Mr. Goffigan's father refused to recognize that Mr. Goffigan was even his son, and it was not until later in life that his father finally recognized and claimed Mr. Goffigan as his child. Consequently, Mr. Goffigan grew up without a father. *See* PSR ¶ 104.

To make matters worse, Mr. Goffigan was also constructively abandoned by his mother, who was a drug addict. At the young age of two, Mr. Goffigan witnessed police officers raid his home and take his mother into custody. During an interview with probation, Mr. Goffigan's mother acknowledged that she suffered from an addiction to "crack" cocaine, and as a result, she failed them as a mother. She advised that there were periods that her children had to "raise themselves" because of her addiction. For the remainder of his childhood, he was tossed from home to home. He started at his cousin's house, where he lived until he was eight years old. Less than one year later, when he turned nine, Mr. Goffigan was placed in custody of his maternal aunt, who abused the funds provided to her by the Government that were meant to cover the cost of Mr. Goffigan's care. He shared a bedroom with multiple family members along with his siblings. On at least one occasion during that experience, Mr. Goffigan also witnessed his cousin being molested. Mr. Goffigan lacked clothing and other basic human needs-including emotional, psychological and developmental. *See* PSR ¶¶ 104, 105.

Mr. Goffigan was eventually removed from his Aunt's home when he was thirteen-years-old, moving in and out of the foster care system. Ultimately, he went to live with his sister in Virginia Beach. In a scene that was all too familiar, Mr. Goffigan was once again living in a neighborhood ridden with drugs, although his sister tried to keep them out of the home. When Mr. Goffigan turned nineteen, he moved out on his own. *See* PSR ¶ 104.

Due to the instability in his home environment, and then, eventually, his contact with the juvenile justice system, not surprisingly Mr. Goffigan's education suffered. Without a strong educational background, good role models, unstable living environment, and potential limitations as to his functioning. According to his social history, Mr. Goffigan was tested three years consecutively from 1990 – 1992, and it was suggested that he was functioning at the borderline mentally deficient range of academic potential. *See* PSR ¶¶ 115, 118-120. Mr. Goffigan turned to what he grew up around and was a direct product of his environment. *See* PSR ¶ 107.

Mr. Goffigan has three children whose ages are thirteen, thirteen, and seven months. The mothers' to his children expressed that Mr. Goffigan has a good relationship with his children, and he makes a respectable effort to care for his children. *See* PSR ¶¶ 111-113. There is a factual dispute between the comment made by Ms. Uzzle in paragraph 111, and the comment alleged to have been made for an emergency protective order. As this does not affect the guidelines, Mr. Goffigan submits that the statement made by Ms. Uzzle to the probation officer is the most accurate information. *See* PSR ¶ 111.

Mr. Goffigan is in fair health. On August 10, 2015, Mr. Goffigan was shot in his right chest at close range. Life-saving surgery was required, and Mr. Goffigan remained in the hospital for some time, also requiring post-release care. At the time of his arrest on September 24, 2015, Mr. Goffigan remained in his home, recovering from the injury. He still suffers significant

discomfort, along with permanent scarring. The attempted murder on Mr. Goffigan's life has forever changed him, requiring him to reflect on his own mortality, and the effect the event had on on others.

**The Requested Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law, Provides Just Punishment, Affords Adequate Deterrence, and Protects the Public**

Mr. Goffigan respectfully submits that a sentence below the advisory guidelines is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to both Mr. Goffigan and the public. Mr. Goffigan is fully aware of the consequences of his actions. Mr. Goffigan desires to improve his life and become a better person and a productive citizen. Mr. Goffigan is still young and a sentence below the advisory guidelines would allow him a chance to turn his life around and make a positive presence in his children's lives and the community.

**NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES PURSUANT TO 18 U.S.C. §3553(a)(6)**

**Career Offender Guideline**

This factor initially seems to encourage deference to the Guideline range, because the Guidelines were developed to eliminate unwarranted sentencing disparities in federal courts. In practice, however, the focus of the Guidelines has gradually moved beyond elimination of *unwarranted* sentencing disparities, and toward the goal of eliminating *all* disparities. This outcome is not only impractical, but undesirable. The career offender provisions of the Guidelines, as applied to this case, perfectly exhibit the limits of a Guideline-centric approach. The career offender guideline provision provides no mechanism for evaluating the relative seriousness of the underlying prior convictions or the age of the prior convictions – in this case, 2002 and 2004. Instead of reducing unwarranted sentencing disparities, such a mechanical

11

approach ends up creating additional disparities because this Guideline instructs courts to substitute an artificial offense level and criminal history in place of each individual defendant's precise characteristics.

Most recently, the United States Sentencing Commission released its *Report to the Congress: Career Offender Sentencing Enhancements* ("the Report") in July 2016. The full report and the executive summary may be found on line at http://www.ussc.gov/research/congressional-reports/2016-report-congress-career-offender-enhancements. Among its findings, the Report determined that as a result of the lengthy sentences career offenders receive, with an average sentence of more than 12 years, they now account for more than 11 % of the Bureau of Prisons population. "These findings prompted the Commission to explore concerns that the career offender directive fails to meaningfully distinguish among career offenders with different types of criminal records and has resulted in overly severe penalties for some offenders." *Report to the Congress: Career Offender Sentencing Enhancements*, *Executive Summary*, page 2. The Report goes on to recommend that Congress amend the directive to no longer include those who currently qualify as career offenders based solely on drug trafficking offenses. *See Report to the Congress: Career Offender Sentencing Enhancements*, *Executive Summary*, page 3.

Based upon the other arguments herein, along with the Report's recommendations, Mr. Goffigan submits that a sentence below the advisory guidelines, either under §§2D1.1 or 4B1.1, more readily satisfy the mandate of 18 U.S.C. §3553, regarding a sentence that is sufficient, but not greater than necessary.

**Drug Disparity Ratio**

As set forth in the PSR, Mr. Goffigan purchased powder cocaine and cooked it into "crack" cocaine, where he then sold the "crack" cocaine.  Mr. Goffigan objects to the drug amount based upon the ratio of the conversion of "crack" cocaine to marijuana.

Congress, originally believed that crack was significantly more dangerous than powder cocaine in that: (1) crack was highly addictive; (2) crack users and dealers were more likely to be violent than users and dealers of other drugs; (3) crack was more harmful to users than powder; (4) crack was especially prevalent among teenagers; and (5) crack's potency and low cost made it popular.  *See Kimbrough v. United States*, 128 S. Ct. 558, 567 (2007) (citing United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy (May 2002) (the 2002 Report)).  To address the concerns, Congress passed Anti-Drug Abuse Act of 1986 ("the 1986 Act"), which authorized a 100-to-1 ratio sentencing scheme.  *See* Pub. L. 99-570, 100 Stat. 3207.  In other words, it equated a single gram of crack with 100 grams of powder cocaine.

At the time, the newly created United States Sentencing Commission adopted the 1986 Act's sentencing scheme without utilizing the required empirical approach found upon past sentencing practices.  *See Kimbrough*, 127 S. Ct. at 567; United State Sentencing Commission, *The Crack Sentencing Disparity and the Road to 1:1* (2009), *available at* http://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2009/016b_Road_to_1_to_1.pdf.

Since then, studies have continued to show unwarranted disparities between treatment of crack cocaine and powder cocaine offenses.  The Sentencing Commission has made multiple attempts since the 1986 Act to remedy the presumptuous problems with the unwarranted ratio.  For instance, the Commission in 1995 and again in 1997 proposed amendments to modify the

crack/powder ratio; but unfortunately, Congress declined to implement the proposed changes. *See, e.g.,* Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25075-25077 (1995); Pub. L. 104-38 § 1, 109 Stat. 334; United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* 2 (Apr. 1997).

In 2007, the Commission enacted a series of amendments as an effort to combat crack/powder disparities. Amendment 706, for example, reduced the base offense level for the majority of crack offenses by two levels. Amendments to the Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28571-72 (2007). Continuing to remedy the problem, the Fair Sentencing Act of 2010 was signed into federal law to help reduce the disparity between the amount of crack cocaine and powder cocaine needed to trigger certain federal criminal penalties from 100:1 weight ratio to an 18:1 weight ratio and eliminated the five-year mandatory minimum sentence for simple possession of crack cocaine.

The Department of Justice has also recognized that the disparity between crack and power cocaine should be completely eliminated. *See, e.g.*, Testimony of Lanny Breuer, Head of the Department of Justice's Criminal Division, April 29, 2009, *available at* http://www.judiciary.senate.gov/pdf/09-04-29BreuerTestimony.pdf.

While recognition of the injustices caused by the crack/powder disparity are growing, a crack-to-powder ratio of 1-to-1 has yet to be enacted. Given that studies have shown that crack and powder cocaine are the same drug in different forms, and that crack cocaine crimes are punished more harshly than powder cocaine offenses, Mr. Goffigan objects to the probation officer's drug amount based on the ratio of the conversion of "crack" cocaine into marijuana.

Mr. Goffigan respectfully submits that the crack-to-powder ratio should be 1-to-1 and that a conversion to marijuana based on that ratio is proper. Had this been done, the cocaine base

equivalency to marijuana would have been approximately 300 kilograms. After adding the 600 kilograms of powder cocaine, the total amount of cocaine would be 900 kilograms, or a base offense level of 28, substantially lower than the current base offense level of 32. *See* PSR ¶ 41.

Should the Court affirm the application of the ratios as they currently are set forth in the PSR, Mr. Goffigan respectfully requests that this Court consider the substantial disparity as to the ratios applied between cocaine base and powder cocaine pursuant to 18 U.S.C. § 3553(a)(6).

## Comparison to Other Similarly Situated Defendants

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual offenders* who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Other similar cases with similarly situated defendants in the Norfolk Division have resulted in varying sentences, often including charges under 18 U.S. C. § 924(c). These defendants were charged in much more sophisticated, violent and gang-related activities. The least criminal penalty located resulted in a sentence of 100 months in the case of Lee Graham Sawyer, III, criminal case number 2:15cr49. Alonzo Outten, in criminal case number 2:15cr80, received 360 months for leading a criminal enterprise, after entering a guilty plea to a count requiring a mandatory minimum

of twenty years for more than a kilogram of heroin. It is unknown whether any of these persons were designated Career Offenders.

In related cases, Jeremy Saunders, after a guilty plea, but after a loss of acceptance of responsibility, received 240 months for a conspiracy drug trafficking charge involving four types of drugs, converted to more than 34,678 kilograms of marijuana. He received an additional 60 months consecutive to this, due to a firearm. Had he been given acceptance of responsibility, a lower sentence may have resulted. *See United States of America vs. Jeremy Saunders*, 2:15cr2. His twin brother, Jason Saunders, over whose trial this Court presided, received a sentence of 120 months on the drug conspiracy and related drug charges, along with 360 months consecutive for two firearm charges. *See United States of America vs. Jason Saunders*, 2:15cr2. Both of these young men were designated Career Offenders.

Mr. Goffigan is attributed with close to 6000 kilograms of marijuana, after conversion from cocaine and cocaine base, yet he faces a sentence that is longer than some of these other defendants, whose actions should be considered more egregious.

## **CONCLUSION**

For the reasons advanced above, Mr. Goffigan respectfully moves for a sentence below the advisory guideline ranges set forth herein. Such a sentence is sufficient to comply with the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

QUINN AUSIDI GOFFIGAN

By      /s/
Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Assistant Federal Public Defender
Attorney for Quinn Ausidi Goffigan
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone:   (757) 457-0890
Facsimile:   (757) 457-0880
suzanne_katchmar@fd.org

17

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of August, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Kevin Patrick Hudson
Assistant United States Attorney
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, Virginia 23510
Kevin.Hudson@usdoj.gov

And I hereby certify that I will send by electronic mail the document to the following non-filing user:

Darryl A. Upshur
United States Probation Officer
U.S. Probation Officer
600 Granby Street, Suite 200
Norfolk, Virginia  23510

_____/s/_____
Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Assistant Federal Public Defender
Attorney for Quinn Ausidi Goffigan
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone:    (757) 457-0890
Facsimile:     (757) 457-0880
suzanne_katchmar@fd.org